SECOND DIVISION
September 19, 2006

No. 1-06-0290

| | | |
|---|---|---|
| ILLINOIS NATIVE AMERICAN BAR ASSOCIATION (INABA), an Illinois Non-for-Profit Corporation, STEPHEN NARANJO, a University of Illinois at Chicago student; ROGER FONTANA, a Champaign resident; BESS VAN ASSELT, a University of Illinois at Champaign Urbana student; JOHN LOW, an enrolled Potawatomi; and TOM CAFCAS, a University of Illinois at Champaign-Urbana student, | ) ) ) ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | |
| THE UNIVERSITY OF ILLINOIS BY ITS BOARD OF TRUSTEES and TRUSTEES DAVID DORRIS, KENNETH D. SCHMIDT, FRANCES G. CARROLL, LAWRENCE C. EPPLEY, MARJORIE E. SODERMANN, ROBERT F. VICKREY, DEVON C. BRUCE, NIRANJAN S. SHAH, ROBERT Y. SPERLING, NATALIE A. GARCIA, ANDREW M. HOLLINGSEAD, and MATTHEW T. DILLER, in their official capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) | Honorable David R. Donnersberger, |
| Defendants-Appellees. | ) | Judge Presiding. |

PRESIDING JUSTICE WOLFSON delivered the opinion of the court:

At some point during the halftime of University of Illinois football games Chief Illiniwek performs a certain dance. The plaintiffs filed a lawsuit against the University, contending the performance violates the Illinois Civil Rights Act of 2003. They ask for a declaratory judgment, damages, and an injunction ordering a stop to the performance

1-06-0290

and barring any University use of Chief Illiniwek, whom the plaintiffs refer to as a "sports mascot," while the defendants describe him as a "symbol."

Defendants filed a motion to dismiss, contending the Illinois legislature specifically approved the University's continued use of the Chief when it passed a 1996 amendment to the University of Illinois Act declaring Chief Illiniwek an "honored symbol" of the University. Plaintiffs contend the Illinois Civil Rights Act cannot be reconciled with the 1996 statute, and, they say, the Civil Rights Act controls.

The trial court found no conflict between the two statutes. It dismissed plaintiffs' complaint. It did not address the question of whether discrimination occurred. We affirm the trial court.

FACTS

The first Chief Illiniwek performance took place during halftime of an Illinois-Pennsylvania football game in 1926. B. Crowley, <u>Resolving the Chief Illiniwek Debate: Navigating the Gray Area Between Courts of Law and the Court of Public Opinion</u>, 2 DePaul J. Sports L. & Contemp. Probs. 28, 32 (2004). Chief Illiniwek performs a type of "fancy dancing," which employs a double step, intricate footwork, and spinning movements. 2 DePaul J. Sports Law at 32. It is a considerably faster style of dance than traditional Indian dances. 2 DePaul J. Sports Law at 32. The dance is part of a performance known as the "Three in One," consisting of three songs. 2 DePaul J. Sports Law at 32.

> "The first is called 'Pride of the Illini' and is performed while
>
> the Marching Illini band marches toward the north end zone

in an 'I' formation. This song carries a traditional marching beat. Chief Illiniwek then weaves his way through the band and emerges at midfield as the band spreads out into an 'I-L-L-I-N-I' formation and performs his dance to the tune of the second song, 'March of the Illini,' which carries a tom-tom beat. At the conclusion of the dance, the Chief stands at midfield with his arms folded across his chest as the fans sing 'Hail to the Orange,' the university alma mater. At the conclusion of 'Hail to the Orange,' Chief Illiniwek exits the field with the band as 'March of the Illini' is being played." 2 DePaul J. Sports Law at FN 18.

Plaintiffs' "Amended Complaint for Declaratory and Injunctive Relief as to the Sports Mascot Chief Illiniwek" was brought under the Illinois Civil Rights Act of 2003. Pursuant to the Act, a unit of state, county, or local government in Illinois may not:

"(1) exclude a person from participation in, deny a person the benefits of, or subject a person to discrimination under any program or activity on the grounds of that person's race, color, or national origin; or

(2) utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, or national origin.

(b) Any party aggrieved by conduct that violates subsection

1-06-0290

> (a) may bring a civil lawsuit, in a federal district court or State
>
> circuit court, against the offending unit of government.  Any
>
> State claim brought in federal district court shall be a
>
> supplemental claim to a federal claim***"  740 ILCS 23/5(a)
>
> (2004).

Seven years earlier, the General Assembly enacted section 1f of the University of Illinois Act, which provides:

> "Consistent with a long-standing, proud tradition, the General
>
> Assembly hereby declares that Chief Illiniwek is, and may
>
> remain, the honored symbol of a great university, the
>
> University of Illinois at Urbana-Champaign."  110 ILCS
>
> 305/1f (West 1996).

The plaintiffs allege the members of the Illinois Native American Bar Association (INABA) "suffer personally and professionally from the racist policy of the University in allowing the use of Chief Illiniwek as a sports mascot."

They allege plaintiffs Stephen Naranjo, a Santa Pueblo, New Mexican Indian enrolled at the University of Illinois at Chicago, and Roger Fontana, a Cherokee descendant and a resident of Champaign, Illinois, feel "humiliated, embarrassed and discriminated against when [their] heritage is reduced to a half-time sporting event entertainment by Chief Illiniwek performances" and feel "that the image of Chief Illiniwek is inaccurate and demeans their culture and race."

Bess Van Asselt, a student at the University, "has been harassed and humiliated

4

by persons that support the perpetuation of Chief Illiniwek as a sports mascot \*\*\*," causing her to feel isolated and alienated within her dorm to the degree that she withdrew from her residential contract and moved.

John Low, a member of the Potawatomi Tribe and a student at the University of Michigan, decided to study at Michigan rather than Illinois "as a result of the hostile atmosphere against Native Americans at the University of Illinois arising out of the Chief Illiniwek controversy."

Tom Cafcas, a student at the University whose family traces back to the Iroquois, "considers the Anglo-American construction of Chief Illiniwek to be a reminder of how exploitation and distortion of Native American culture and religion is woven into institutions like the University of Illinois without concern for the damage done to Native American students."

Among other things, plaintiffs allege:

"Chief Illiniwek's half-time performances at University of Illinois football and basketball games are false, misleading and demeaning characterizations of Native Americans and their culture."

\* \* \*

"The Chief's performances at sporting events is [sic] insulting, demeaning, humiliating and discriminates against Native Americans and Native American students at the University of Illinois."

1-06-0290

* * *

"The Plaintiffs, Native American students, and those that associate with them, are effectively barred from attending University of Illinois sporting events where Chief Illiniwek performs because to attend would be humiliating and demeaning."

* * *

"The Defendants knowingly have exploited Native Americans by profiting from the perpetuation of false, misleading and demeaning images of Native Americans in the form of Chief Illiniwek."

* * *

"The Defendants' use of Chief Illiniwek as a mascot at sporting events is a catalyst for students and others to imitate Chief Illiniwek on and off campus."

* * *

"The Defendants' use of Chief Illiniwek as a mascot creates a hostile, demeaning and discriminatory environment for Native Americans on campus."

* * *

"When students and others imitate Chief Illiniwek on campus and elsewhere, it is humiliating, demeaning and

8

discriminates against Native American students that attend the University of Illinois, because it subjects them to disparate treatment and deprives them of an education that is free from humiliation and harassment."

Plaintiffs seek the following relief: (1) a judicial declaration that the Chief Illiniwek "mascot" is demeaning and discriminatory to Native Americans and violates the Illinois Civil Rights Act; (2) temporary and permanent injunctive relief enjoining the University from continuing to use Chief Illiniwek as a "sports mascot" and from allowing "entertainment" performances by the Chief at University events; and (3) damages and attorney's fees and costs.

The defendants' motion to dismiss plaintiffs' amended complaint for failure to state a claim contends: (1) the Illinois Civil Rights Act should not be construed to prohibit the University's use of Chief Illiniwek because it would improperly invalidate section 1f of the University of Illinois Act; (2) plaintiffs' allegations are insufficient to state a claim for discrimination under the Civil Rights Act; and (3) the Civil Rights Act authorizes civil suits only against the "offending unit of government," not against individuals.

The trial court granted the defendants' motion to dismiss, finding there was no conflict between the statutes, that the legislature specifically authorized the University's use of the Chief as its symbol or mascot. The court declined to consider defendants' additional arguments for dismissal, but noted plaintiffs may not sue individual trustees under the Illinois Civil Rights Act. 740 ILCS 23/5(b) (West 2004).

1-06-0290

DECISION

A motion to dismiss challenges the legal sufficiency of a complaint by alleging defects on its face.  735 ILCS 5/2-615 (West 2000).  In reviewing the sufficiency of a complaint, we accept as true all well-pleaded facts and all reasonable inferences that may be drawn from those facts and construe the allegations in the light most favorable to the plaintiff.  City of Chicago v. Beretta U.S.A. Corp., 213 Ill. 2d 351, 364, 821 N.E.2d 1099 (2004).  Our review is de novo.  Beretta, 213 Ill. 2d at 364.

Plaintiffs contend the two statutes at issue are irreconcilably conflicting and ask this court to decide which statute controls.  They say the Illinois Civil Rights Act relates to discrimination and civil rights, while the University of Illinois Act is silent on those subjects.  Because the statutes are not governed by the same spirit or policy and do not relate to the same subject, plaintiffs contend the two provisions cannot be harmonized.  Furthermore, when the legislature passed the Illinois Civil Rights Act in 2003, it is presumed to have been aware of section 1f of the University of Illinois Act, passed in 1996.  Yet, the legislature did not include an exception in the Civil Rights Act allowing the University to "discriminate against Plaintiffs through the use of an 'Indian' mascot, Chief Illiniwek."  As the later and more specific statute, the Civil Rights Act should control, plaintiffs say.

The plaintiffs rely on the Illinois Supreme Court's decision in State v. Mikusch, 138 Ill. 2d 242, 562 N.E.2d 168 (1990).  In Mikusch, several secretary of state investigators were forced to retire at age 60 under section 2-115 of the Vehicle Code.  The Vehicle Code had been amended on June 20, 1979, to mandate retirement for any

10

investigator after reaching the age of 60.  Mikusch, 138 Ill. 2d at 245-46; Ill. Rev. Stat.

1981, ch. 95 1/2, par. 2-115.  The investigators filed suit under the Human Rights Act,

enacted on November 8, 1979, which prohibits discrimination in employment because of

age.  Ill. Rev. Stat. 1981, ch. 68, par. 1-101 et seq.  At that time, "age" was defined as

"the chronological age of a person who is 40 but not yet 70 years old."  Ill. Rev. Stat.

1981, ch. 68, par. 1-103(A).  The court set out general rules of statutory construction we

apply in this case:

> "The fundamental rule of statutory construction, of course, is
> to give effect to the intent of the legislature.  [Citation.]  In
> seeking to ascertain legislative intent, courts consider the
> statutes in their entirety, noting the subject they address and
> the legislature's apparent objective in enacting them.
> [Citation.]  It is presumed that the legislature, in enacting
> various statutes, acts rationally and with full knowledge of all
> previous enactments.  [Citation.]  It is further presumed that
> the legislature will not enact a law which completely
> contradicts a prior statute without an express repeal of it and
> that statutes which relate to the same subject are to be
> governed by one spirit and a single policy.  [Citations.]"
> Mikusch, 138 Ill. 2d at 247-48.

The court rejected the Secretary's argument that section 2-115 could be

harmonized with the Human Rights Act by reading section 2-115 as an exception to the

11

Human Rights Act. The expression of certain exceptions in a statute will be construed as an exclusion of all others. Mikusch, 138 Ill. 2d at 250. The detailed list of exceptions in the Human Rights Act did not include one allowing the mandatory retirement of Secretary of State investigators. Mikusch, 138 Ill. 2d at 250. The two statutes were "directly in conflict." Mikusch, 138 Ill. 2d at 249.

Furthermore, because the Human Rights Act was enacted after the amendment to section 2-115, the court assumed the legislature was aware of its previous enactment. Mikusch, 138 Ill. 2d at 250. The court considered the legislature's failure to provide for the mandatory retirement of Secretary of State investigators as indicating its intent not to make mandatory retirement for investigators an exception to the Act. Mikusch, 138 Ill. 2d at 250.

After determining the two statutes were irreconcilable, the court concluded the Human Rights Act was controlling because it was enacted after section 2-115. "When two statutes appear to be in conflict, the one which was enacted later should prevail, as a later expression of intent." Mikush, 138 Ill. 2d at 254. The Human Rights Act also was the more specific statute on the issue of age discrimination. In the case of two conflicting statutes, the more specific legislation should control over the more general one. Mikusch, 138 Ill. 2d at 254. The court did not rely on a repeal by implication.

Plaintiffs' position is not entirely clear to us. We cannot tell whether they are contending the Civil Rights Act repealed by implication the 1996 statute when they say the two statutes are "irreconcilable." Repeal by implication is applied when two enactments of the same legislative body are irreconcilable. Lily Lake Road Defenders

12

v. County of McHenry, 156 Ill. 2d 1, 8, 619 N.E.2d 137 (1993). A statute that is repealed by implication is legally eliminated. Lily Lake, 156 Ill. 2d at 8. Repeals by implication are not favored. Lily Lake, 156 Ill. 2d at 9. In any case, our examination of the legislative purpose behind the amended Illinois Civil Rights Act compels us to conclude there is no conflict between the two statutes. In construing statutes alleged to be irreconcilable, legislative intent is the paramount consideration. Moore v. Green, 219 Ill. 2d 470, 479, 848 N.E.2d 1015 (2006). " 'Traditional rules of statutory construction are merely aids in determining legislative intent, and these rules must yield to such intent.' " Moore, 219 Ill. 2d at 479, quoting Paszkowski v. Metropolitan Water Reclamation District of Greater Chicago, 213 Ill. 2d 1, 7, 820 N.E.2d 401 (2004).

An examination of the legislative debates helps us understand what the General Assembly was "particularly concerned with" when it passed the Act. People v. Maya, 105 Ill. 2d 281, 285, 473 N.E.2d 1287 (1985). The Civil Rights Act was introduced in the House of Representatives as House Bill 2330. The statements of a bill's sponsor matter when determining legislative intent. Emerald Casino, Inc. v. Illinois Gaming Board, 346 Ill. App. 3d 18, 36, 803 N.E.2d 914 (2003). The sponsor of House Bill 2330 said:

> "Fritchey: The Bill provides a venue for individuals to bring a
> cause of action alleging disparate impact of a government
> policy via the State Courts which they presently do not have.
>
> *     *     *

13

1-06-0290

> Again, it's just by way of history, there was a Supreme Court
> case which limited the ability of individuals to bring actions
> pursuant to Title VI under the Federal Act and we are simply
> trying to reinstate the ability of individuals to sue under the
> State Act.  <u>It's not intended to expand or limit whatever rights
> somebody would've had</u>."  (Emphasis added.)  93d Ill. Gen.
> Assem., House Proceedings, April 3, 2003, at 146-48
> (statements of Representative Fritchey).

Statements by the sponsor of the bill in the Senate further explain the intent:

> "Senator Harmon: *** [The bill] does not break any new legal
> ground nor create any new rights.  Rather, it creates a State
> right of action that has existed at the federal level for over
> thirty years*** <u>There is no new exposure for the State, simply
> a new venue--State court rather than federal court</u>."
> (Emphasis added.)  93d Ill. Gen. Assem., Senate
> Proceedings, May 21, 2003, at 9-10 (statements of Senator
> Harmon).

It is clear from the legislators' comments and from the language in subsection (b) of the statute that the Act was not intended to create new rights.  It merely created a new venue in which plaintiffs could pursue in the State courts discrimination actions that had been available to them in the federal courts.

There is no indication in the Civil Rights Act that the legislature intended to

14

"overrule" or otherwise diminish its declaration in the University of Illinois Act that "Chief Illiniwek is, and may remain, the honored symbol of a great university, the University of Illinois at Urbana-Champaign." 110 ILCS 305/1f (West 1996). Courts presume the legislature envisions a consistent body of law when it enacts new legislation. Lily Lake, 156 Ill. 2d at 9. We presume the legislature is aware of all previous enactments when it enacts new legislation. Mikusch, 138 Ill. 2d at 247-48. Given the direct language and glowing exaltation of Chief Illiniwek in the 1996 statute, we believe that had the legislature intended to repeal the provision or supercede it, it would have done so expressly.

There is no "irreconcilable conflict" or contradiction between the statutes. Nor is there a need to harmonize the two provisions since the statutes are not related. The plaintiffs concede the two statutes "do not pertain to the same subject and legislative mission," and section 1f "is silent on the subjects of discrimination and civil rights." In order for two statutes to be in irreconcilable conflict, they must relate to the same subject. Mikusch, 138 Ill. 2d at 248. They do not in this case.

In Mikusch, there was clear authority holding the Human Rights Act prohibited mandatory retirement based on age. The section of the Vehicle Code mandating retirement for investigators after age 60 directly conflicted with the Act, which prohibited mandatory retirement before age 70. The plaintiffs in this case assume the University's use of Chief Illiniwek constitutes "discrimination," as defined in the Illinois Civil Rights Act of 2003. They provide no authority for their conclusion.

The plaintiffs contend the legislature's failure to include an exception or

15

exemption for the University's use of Chief Illiniwek in the Civil Rights Act supports their contention that the Civil Rights Act rendered the 1996 statute inoperative. We believe the more reasonable interpretation is that the legislature did not find it necessary to exempt the University's actions because it did not consider them to be a form of "discrimination" under the Civil Rights Act. We do not make any further inquiry into the plaintiffs' questionable assertion that their allegations amount to a valid claim of discrimination under the Act. At any rate, plaintiffs have not shown the Act had any effect on the legislature's clear statement of affection for Chief Illiniwek in the 1996 statute.

Accordingly, we affirm the trial court's dismissal of plaintiff's complaint.

Affirmed.

HOFFMAN, J., specially concurring.

HALL, J., dissenting.


JUSTICE HOFFMAN, specially concurring:

I agree with Justice Wolfson's reasoning, but write separately because I believe there is a more basic reason why the dismissal of the plaintiffs' amended complaint should be affirmed; namely, it fails to allege facts, which if true, would entitle the plaintiffs to the relief they seek even in the absence of the provisions of section 1f of the University of Illinois Act (110 ILCS 305/1f (West 2004)).

The plaintiffs' amended complaint purports to state a claim

16

1-06-0290

against the University of Illinois (University) and its board of trustees for a violation of the Illinois Civil Rights Act (Civil Rights Act) (740 ILCS 23/1, et seq. (West 2004)).  Specifically, the plaintiffs assert that the University's use of Chief Illiniwek (Chief) as a sports mascot violates section 5 of the Civil Rights Act ((740 ILCS 23/5 (West 2004)).

Section 5(b) of the Civil Rights Act provides a private right of action in favor of any person aggrieved by conduct that violates subsection (a) of the statute.  Section 5(a) provides that:

"(a) No unit of State, county or local government in Illinois shall:

(1) exclude a person from participation in, deny a person the benefits of, or subject a person to discrimination under any program or activity on the grounds of that person's race, color or national origin; or

(2) utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color or national origin." 740 ILCS 23/5(a) (West 2004).

The plaintiffs make no claim that the University violated section 5(a)(2); rather, their action appears to be based on a claim of discrimination under section 5(a)(1).  The term "discrimination" is not defined in the statute.  However, Webster's  Third New International Dictionary defines the word as, inter alia, the act

17

or practice of "according of differential treatment to persons of an alien race or religion."  Webster's  Third New International Dictionary 648 (1981).   Black's Law Dictionary defines discrimination as "[t]he effect of a law or established practice that confers privileges on a certain class or that denies privileges to a certain class because of race, age, sex, nationality, religion, or handicap."  Black's Law Dictionary 479 (7th ed. 1999).

Five individuals joined as plaintiffs in this action: Stephan Naranjo, a Native American student at the University; Roger Fontana, a Native American; Bess Van Asselt, a student at the University; John Low, a Native American student at the University of Michigan; and Tom Cafcas, a Native American student at the University.  Clearly, no claim has been stated as to Van Asselt as the amended complaint does not allege that she is a Native American or that she was in any way discriminated against because of her race, color or national origin.  See 740 ILCS 23/5(a)(1) (West 2004).  Additionally, her assertions of retaliation by fellow students because of her opposition to the Chief form no basis for relief.   The Civil Rights Act, unlike the Human Rights Act, does not grant a right of action to a person who experiences retaliation because he or she has opposed that which he or she reasonably believes to be unlawful discrimination.  See 775 ILCS 5/6-101(A) (West 2004).  The claims of the remaining individual plaintiffs, all of whom are alleged to be Native Americans, present different

18

1-06-0290

considerations.

The amended complaint alleges that Naranjo and Fontana feel "humiliated and embarrassed" when their heritage is reduced to "half-time sporting event entertainment" by the Chief's performances. Low alleges that he decided to attend the University of Michigan, rather than the University of Illinois, as "a result of the hostile atmosphere against Native Americans at the University of Illinois arising out of the Chief Illiniwek controversey." Cafcas asserts that the "Anglo-American construction of Chief Illiniwek" reminds him of how "the exploitation and distortion of Native American Culture and religion is woven into institutions like the University of Illinois." Conspicuously absent from the amended complaint is any allegation that the University excluded these individual plaintiffs from participation in, or the benefits of, any program or activity based on their Native American heritage. Rather, they allege that they find the Chief's performances to be insulting, demeaning, and humiliating and, as a result, do not attend University sporting events where the Chief performs or, in the case of Low, chose to attend a different university. According to the amended complaint, the use of the Chief as a sports mascot creates a hostile environment for Native Americans.

It appears that the Native American plaintiffs' claims of discrimination are based upon their subjective feelings and the assertion of a hostile environment based upon the Chief's

19

performances. However, in the absence of any allegation that the individual Native American plaintiffs had ever been denied admittance to any University program, activity, or event based upon their race or color, I am left with the question of whether the allegations in their amended complaint state a claim for discrimination within the meaning of section 5(a)(1) of the Civil Rights Act.

The amended complaint states that the Chief wears orange and blue face paint and is dressed in a costume which includes a feathered head garment and fringed shirt and pants. His half-time performances at sporting events include a ritual where he prances about the field of play, waiving his arms about vigorously, and leaping high into the air as he splits his legs. Upon completing what the plaintiffs refer to as a "spasm of gymnastic maneuvers," the Chief composes himself and walks off the playing field. Distilled to its finest, the plaintiffs' amended complaint asserts that the symbolism of the Chief's performances is discriminatory, and it is that symbolism which the plaintiffs assert creates a hostile environment.

Because of the nature of the Civil Rights Act, it should be accorded a liberal interpretation in order to effectuate its purpose. The actions prohibited by the statute are not limited to tangible deprivations such as the exclusion of an individual from participation in a program or the denial of any specific benefit. The inclusion in section 5(a)(1) of a proscription against

20

subjecting a person to discrimination under any program or activity based on that persons race, color, or national origin evinces a legislative intent to define discrimination in its broadest possible terms and prohibit all forms of disparate treatment. Consequently, I believe that a plaintiff can establish a violation of section 5(a)(1) of the Civil Rights Act by proving discrimination predicated upon a hostile environment. See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66-67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). However, if the mere uttering of disparaging words or phrases about a class of persons which engenders offensive feelings is insufficient to establish a hostile environment (see McPhaul v . Board of Commissioners of Madison County, 226 F.3d 558, 566-67 (7th Cir. 2000)), I believe it follows that gestures or dress which a member of a class may find offensive are also insufficient. Conduct which is not severe enough to create a hostile environment is beyond the purview of section 5(a)(1).

In this case, the Native American plaintiffs have alleged subjective feelings of embarrassment and humiliation by the Chief's performances and that they find the symbolism that the Chief represents to be both insulting and demeaning. However, I do not believe that the conduct of which they complain is objectively hostile. These plaintiffs made no charge that any of the Chief's actions were directed to them as individuals; rather, they assert insult as members of a class. Although some Native Americans may well find the Chief to be insulting and demeaning, his performances

21

are certainly not of such a character that a reasonable person would find so abusive that it would interfere with his or her ability to participate in, or benefit from, the University's programs or activities. For this reason I am of the opinion that the plaintiffs' amended complaint fails to state a cause of action under section 5 of the Civil Rights Act.

The trial court dismissed this action based on the grounds addressed by Justice Wolfson. However, the defendants raised the amended complaint's failure to allege facts rising to the level of discrimination as a basis for dismissal before the trial court, and the University raised the issue in its brief before this court. A reviewing court can affirm a trial court's decision on any ground apparent from the record (<u>Material Service Corp. v. Department of Revenue</u>, 98 Ill. 2d 382, 387, 457 N.E.2d 9 (1983)), and I believe that the failure of the plaintiffs to allege facts rising to the level of discrimination within the meaning of section 5(a) of the Civil Rights Act is the principal reason why their amended complaint should be dismissed. For this reason, I concur in the affirmance of the circuit court's judgment.

JUSTICE HALL dissenting.

I respectfully dissent. I am not as confident as my colleagues that plaintiffs' amended complaint fails to state a cause of action under the Illinois Civil Rights Act of 2003 (740 ILCS 23/5(a)(1) (2004)). According to the allegations set forth in the amended complaint, the University's use of Chief Illiniwek as

26

1-06-0290

its sports mascot creates a hostile educational environment for Native American students.  To establish the existence of a racially hostile educational environment, plaintiffs must prove that the alleged discriminatory conduct at issue is sufficiently severe, pervasive, or persistent so as to interfere with their ability to participate in or benefit from the school's services. see Note, *Native American Mascots, Schools, and the Title VI Hostile Environment Analysis*, 1995 U. Ill. L. Rev. 971, 987.

A hostile-environment analysis in the educational context entails an examination of the frequency of the alleged discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the student's academic performance. *Hayut v. State University of New York*, 352 F.3d 733, 745 (2003).  This standard requires the student to present evidence that he or she not only subjectively perceived the environment to be hostile, but also that the environment was objectively hostile or abusive. *Hayut*, 352 F.3d at 745.

In this case, considering the allegations of the amended complaint in the light most favorable to the plaintiffs, I believe the allegations are sufficient to state a cause of action for racially hostile educational environment under the Illinois Civil Rights Act of 2003 (740 ILCS 23/5(a)(1) (2004)). See, *e.g.*, *Daniel v. Bd. of Educ. for Ill. Sch. Dist. U-46*, 379 F. Supp. 2d 952. 963 (N.D. Ill. 2005) (allegations by minority and limited English

27

proficient students that they suffered racially disparate effects as a result of local board of education redistricting plan was sufficient to state a claim under the Illinois Civil Rights Act of 2003 (740 ILCS 23/5(a)(1) (2004))). A trier of fact should decide, on another day, whether plaintiffs can actually prove their allegations, but plaintiffs have pleaded sufficient facts to allege a racially hostile educational environment.

In light of the number of prominent educational institutions that have voluntarily discontinued the use of Native American nicknames, symbols, and mascots (see generally 1995 U. Ill. L. Rev. at 1000), I cannot conclude that a reasonable person in plaintiffs' position would not find that the University's continued official sanctioning of Chief Illiniwek as its sports mascot violates the civil rights of Native American students by creating and contributing to an objectively hostile educational environment.